UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MENA KHALIL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 3:13-cv-01305 |
| v. | ) |
| | ) Judge Sharp |
| TYSON FOODS, INC., | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM

Defendant Tyson Foods, Inc. ("Defendant" or "Tyson") filed a Motion for Summary Judgment (Docket Entry No. 22), to which Plaintiff Mena Khalil ("Plaintiff" or "Khalil") filed a response (Docket Entry No. 32), and Defendant filed a reply (Docket Entry No. 37). For the reasons discussed herein, Defendant's motion will be granted and this case will be dismissed.

# FACTS

Plaintiff was born in Egypt and came to the United States in 2004.[1] Plaintiff started working for Tyson on August 4, 2004, as a Wizard Operator. Approximately a year and half later, Plaintiff applied for and was promoted to a Lead position in the Pork Slice Department. After three years as a Lead, Plaintiff applied for and was promoted to a Supervisor position in the same department.

Plaintiff later made a lateral move to become Supervisor in the Ground Beef Department, where his supervisor was Derrick Ausbrooks ("Ausbrooks"). According to Plaintiff, Ausbrooks

---

[1] The following recitation is drawn primarily from Defendant's Statement of Undisputed Material Facts and Plaintiff's responses thereto (Docket Entry No. 33). Plaintiff has failed to provide a "concise statement of [] additional facts" as required by Local Rule 56.01(b). *See* LR 56.01. Rather, Plaintiff incorporated facts into his *Response to Defendant's Motion for Summary Judgment* (Docket Entry No. 32). In any event, and based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

1

cursed at Plaintiff, saying "[g]et your ass in the office. I want to talk to you." (Plaintiff Dep. at p. 22). According to Plaintiff, this was not the first incident. Ausbrooks screamed and fought with Plaintiff all the time. (*Id.* at p. 24). Plaintiff filed a complaint against Ausbrooks. (*Id.*). After an investigation by the Human Resources Department "("HR Department"), Ausbrooks was suspended for five days and placed on a 30-day action plan upon his return. (*Id.* at p. 23). Plaintiff requested and was granted a transfer back to a Supervisor position in the Pork Slice Department.

Approximately seven or eight months later, Plaintiff transferred back to a Supervisor position in the Ground Beef Department, and reported to General Supervisor Labanot Kolshi ("Kolshi"). As Supervisor in the Ground Beef Department, Plaintiff supervised approximately 25 employees on the second shift.

On February 7, 2013, there was an incident on the line involving Plaintiff and his Line Lead, Hassan Mouchel ("Mouchel"). According to Plaintiff, the battery in his radio went dead, and he stepped away to change it, while leaving Mouchel in charge. (Plaintiff Dep. at p. 46). Plaintiff changed the battery and then went to speak with Kolshi regarding concerns he had about the tray size for the stewed meats. (*Id.* at p. 47). As he was discussing this issue with Kolshi, Todd Gagnon ("Gagnon"), a supervisor in the Beef Department, radioed to Plaintiff. (*Id.*). Plaintiff responded he was on his way, to which Gagnon replied by yelling, "No, what you need to be doing is heading back to your line." (*Id.* at p. 48). When Plaintiff returned to the line, Gagnon informed him that there was too much fat on the meat and that Quality Assurance was going to tag the whole line.

After the February 7, 2013 incident, Mouchel filed a complaint with the HR Department. In his complaint, Mouchel reported the following:

> This letter is to report an incident that occurred on my line last night at around 11:20 pm. Mina Khalil, line Supervisor, behaved in [an] unacceptable manner. He used abusive language towards me that I found to be very offensive for no reason. He was screaming and yelling at me in front of my piers [sic]. He then hit a cart sitting next to me so hard. I felt very threatened he tried to attack me. Please take appropriate action as soon as possible. Feel free to call witnesses from my line.

(Plaintiff Dep. Exh. 13).[2] In response to the complaint, the HR Department conducted an investigation. During the investigation, Plaintiff was interviewed twice by Gary Denton ("Denton"), Complex Human Resources Manager. Khalil's supervisor, Kolshi, was also present during the interviews. As part of the investigation into the February 7, 2013 incident, Denton and Human Resources Manager Audrey Cooper ("Cooper") interviewed 14 other employees, including Hamdi Aden ("Aden") and Boosteyo Hubey ("Hubey").[3] Regarding the incident, Aden reported as follows:

> I was styling on [sic] stew meat line in Beef when I heard the supervisor getting loud and yelling at the team lead [Mouchel]. He was profanity [sic], getting in his face and raising his fingers at him. He said, 'I am the f***ing supervisor on this line and you do whatever the f*** I tell you to do,' talking to the team lead [Mouchel]. He was very loud and disrespectful towards the team lead, [Mouchel], who in return almost broke down in tears. [Plaintiff] was rude and used very bad words in front of his team member.

(Plaintiff Dep., Exh. 14). Hubey, when asked about the February 7, 2013 incident, stated, in relevant part, the following:

---

[2] Plaintiff denies yelling and using profanity during the incident. He also denies using threatening gestures and hitting the cart hard. (Plaintiff Dep. pp. 66-67).

[3] Plaintiff maintains that some employees who provided statements did not like him because he had spoken to some of them about various infractions, including being late for work. (Plaintiff Dep. at pp. 68-71).

3

> Last night between 11:00 and 12:00 midnight I was working on my line normally. I heard a loud voice. When I looked on my left side and saw the supervisor [Plaintiff] [sic] and the lead arguing. The supervisor was yelling at the lead. I did not understand what the conversation was about but I saw the supervisor slammed the tray cart for anger, I think because the [Quality Assurance] lady was there and they were arguing about the fat meat. That is all I know.

(*Id.* Exh., 15).

Based on the investigation, Denton drew the following conclusions: "The results of the investigation substantiated that Khalil returned to the line angry, began to aggressively remove trays of stew meat and throw into gondola. At the same time Mena Khalil screamed at Hassan and got extremely close to his face. The investigation substantiated Mena Khalil used profanity and hit a metal tray cart resulting in a loud boom." Denton and Human Resources Director Eloy Barajas ("Barajas") decided to terminate Plaintiff's employment.[4]

On February 15, 2013, Kolshi and Assistant Operations Manager Steve Ligon ("Ligon") met with Plaintiff to tell him his employment was being terminated.[5] During the termination meeting, Plaintiff was given a copy of a document stating the reason for his termination:

> On February 7, 2013, supervisor Mena Khalil had an incident with lead person Hassan Mouchel. The investigation substantiated that Mena lost his temper, got up into Hassan's face yelling and using profanity. When Mena walked away he hit the tray cart creating a loud boom. Mena violated company HD, management standards of behavior and dignity and respect policies.

(Plaintiff Dep. p. 81, Exh. 16).

---

[4] According to Plaintiff, there were eleven other individuals who engaged in similar conduct but were not terminated. Plaintiff identifies the following employees: (1) Steve Ligon, (2) Derrick Ausbrooks, (3) Troy William, (4) Tadd Gagnon, (5) Hamdi Aden, (6) Abdulqader Omar, (7) Shane Craddock, (8) Doug Griffin, (9) Anibal Banilla, (10) Alban Kolshi, and (11) Mara Phelps.

[5] Mouchel received a written warning for kicking a trash can after the February 7, 2013, incident with Plaintiff. Gagnon received a written warning for failing to calm the situation or report the incident between Plaintiff and Mouchel to the General Supervisor, and for speaking in a loud tone of voice to Plaintiff over the radio on February 7, 2013.

Tyson's Rules of Conduct Policy was discussed with Plaintiff at the time of his hire, and he received yearly training on the Policy. Plaintiff understood that Tyson expects its employees to conduct themselves in an appropriate manner and that unacceptable conduct is not tolerated. Similarly, Plaintiff was also familiar with Tyson's Management Standards of Behavior Policy. Plaintiff understood that Tyson expects its managers to treat employees with dignity and respect. It is undisputed that Defendant considers the severity and degree of any incident when determining whether and to what extent disciplinary action is required to address inappropriate behavior.

## ANALYSIS

Plaintiff, an adult Egyptian, asserts a single claim of national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*[6] He alleges Defendant discriminated against him on the basis of national origin by terminating his employment. Defendant has moved for summary judgment on this single claim.

**I.     Summary Judgment Standard**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914

---

[6] Plaintiff also alleged a claim of retaliation under Title VII and the THRA. However, Plaintiff conceded in his response brief that this claim should be dismissed. (Docket Entry No. 32 at 1).

5

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Title VII National Origin Discrimination Claim

Plaintiff has not produced any direct evidence of national origin discrimination. Therefore, in the absence of direct evidence, Plaintiff's claim is analyzed under the familiar evidentiary framework for cases based on circumstantial evidence set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). Under that framework, Plaintiff must first establish a *prima facie* case of national origin discrimination. *Id.* at 802. If he carries that burden, the burden shifts to Defendant, who must present a legitimate, non-discriminatory reason for its actions. *Id.* at 802-803. Upon Defendant's offer of a legitimate, non-discriminatory reason, the burden shifts back to Plaintiff to demonstrate that the proffered reason is pretextual, masking intentional discrimination. *Id.* at 804.

To establish a *prima facie* case of national origin discrimination under Title VII, Plaintiff must show that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently than a similarly situated employee who was not a member of the protected class, or he was replaced by a person outside the protected class. *See Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). Defendant does not dispute that Plaintiff has established three of the elements required for a *prima facie* case. Defendant contends, however, that Plaintiff cannot satisfy the fourth element – whether similarly situated non-Egyptian employees were treated differently than Plaintiff.

To be deemed similarly-situated, "the employment situation of the comparator must be similar to that of the plaintiff in all relevant aspects." *Romans v. Mich. Dep't of Human Servs.,* 668 F.3d 826, 837 (6th Cir. 2012). For cases involving differential disciplinary action, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)). In cases that involve alleged differential treatment other than disciplinary action, "[c]ourts should not assume [ ] that the specific factors in *Mitchell* are relevant factors in cases arising under different circumstances[.]" *Ercegovich,* 154 F.3d at 352. Instead, courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employees." *Id.* In that context, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order

7

for the two to be considered 'similarly situated;' rather, ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects'." *Id.* (quoting *Pierce v. Commwlth, Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir. 1994)) (emphasis in original).

In his response, Plaintiff contends there are eleven comparators (who are not Egyptian), "six (6) are Supervisors in different departments but therefore have an equal status with Khalil in the managerial hierarchy[7]; one (1) is below Khalil in the employment hierarchy[8]; and the other four (4) are above Khalil in respect to the managerial hierarchy[9]." (Docket Entry No. 32 at 13).

### 1. Troy William

William was a Supervisor in the Pork Slice Department, and he reported to General Supervisor Billy Parker. (Plaintiff Dep. at pp. 99-100). According to Plaintiff, William opened a small knife and told another employee he would cut her with it. (*Id.* at p. 100). Plaintiff does not recall when this incident occurred, and he was not present when it allegedly happened. *(Id.)*. Plaintiff heard that the threatened employee reported the incident to her Supervisor and the HR Department. (*Id.* at pp. 100-101). Plaintiff also heard that William received a three-day suspension. (*Id.* at p. 101).

### 2. Tadd Gagnon

Gagnon was a Supervisor in the Beef Slice Department, and he reported to Lab Kolshi. (Plaintiff Dep. at p. 102). Plaintiff alleges that Gagnon grabbed meat from the line and called it "The f***ing meat." (*Id.* at p. 103). Plaintiff was not present for this incident nor was he

---

[7] Troy William, Tadd Gagnon, Abdulqader Omar, Shane Craddock, Alban Kolshi, and Anibal Banilla

[8] Hamdi Aden

[9] Steve Ligon, Derrick Ausbrooks, Doug Griffin, and Mara Phelps

working in Gagnon's Department at the time this alleged comment was made. (*Id*. at pp. 102-103). Plaintiff heard that Gagnon was sent home that day. (*Id*. at p. 104).

### 3. Abdulqader Omar

Omar was a Supervisor in the Beef Slice Department and reported to Lab Kolshi. (Plaintiff Dep. at p. 105). Plaintiff alleges that Hamdi Aden and Omar were both "cursing [at] each other." (*Id*. at p. 89). This incident allegedly occurred, however, after Plaintiff's termination. (*Id*. at p. 105). Accordingly, Plaintiff does not know what was said between these employees and he does not know if any discipline was issued. (*Id*. at 106).

### 4. Shane Craddock

Craddock worked as a Supervisor in the Pork Slice Department and reported to Valon Arifi. (Plaintiff Dep. at p. 107). Plaintiff alleges that Craddock was upset when one of his employees sent a tray down the wrong line and stated, "I need the f***ing tray from this damn line to this line." (*Id*. at pp. 107-108). According to Plaintiff, the employee did not file a complaint, and he does not know whether Arifi even talked to Craddock about the incident. (*Id*. at pp. 109-110).

### 5. Alban Kolshi

Alban Kolshi was a Supervisor in the Packaging Department, and he reported to Valon Arifi. (Plaintiff Dep. at pp. 142-143). Plaintiff alleges that Kolshi used profanity on the line, but he could not recall any specifics. (*Id.* at p. 143). Plaintiff is not sure whether Kolshi ever received discipline for using profanity or whether anyone ever filed a complaint about his profanity.

6. Anibal Banilla

Banilla was a Supervisor in the Pork Slice Department and reported to Valon Arifi. (Plaintiff Dep. at p. 139). Plaintiff alleges that Banilla would curse on the line, but was never suspended. (*Id*.). Plaintiff also alleges that Banilla would make comments like "f***ing Egyptian people" or "Egyptian p***y." (*Id*.). Plaintiff did not report Banilla's conduct. (*Id*. at p. 140).

7. Hamdi Aden

Aden was a Styler in the Beef Slice Department. (Plaintiff Dep. at p. 105). In the chain of command, Aden was below Plaintiff. (*Id*.). In fact, Aden reported to Plaintiff prior to his termination. (*Id*.). Abdulqader Omar was a Supervisor in the Beef Slice Department and reported to Alban Kolshi. (*Id*.). As stated *supra*, Plaintiff alleges that Aden and Omar were both "cursing [at] each other." (*Id*. at p. 89). This incident allegedly occurred, however, after Plaintiff's termination. Accordingly, Plaintiff does not know what was said between these employees and he does not know if any discipline was issued. (*Id*. at p. 106).

8. Steve Ligon

Steve Ligon was the Assistant Operations Manager on B-Shift. (Plaintiff Dep. at p. 91). In the chain of command, Ligon is above Plaintiff. (*Id*.). Ligon reported to the Operations Manager, Doug Griffin. (*Id*.). Plaintiff alleges that Ligon used profanity one time while he was in his office. (*Id*. at pp. 92, 94). According to Plaintiff, a few of the other Supervisors who were present in Ligon's office filed a complaint with the HR Department. (*Id*. at p. 92). Plaintiff was not involved in those complaints or in the HR Department's investigation. (*Id*. at pp. 93-94). According to Plaintiff, Ligon was suspended for three days. (*Id*. at p. 92).

### 9. Derrick Ausbrooks

Ausbrooks was a General Supervisor in the Ground Beef Department. (Plaintiff Dep. at pp. 94-95). In the chain of command, Ausbrooks was one level above Plaintiff. (*Id*. at p. 95). As discussed *supra*, Plaintiff alleges that Ausbrooks made the following inappropriate comment: "Get your ass back in the office." (*Id*. at p. 96). Plaintiff filed a complaint with Gary Denton in Human Resources and Ausbrooks was given a five day suspension and placed on a 30-day performance improvement plan.

### 10. Doug Griffin

Griffin was the Operations Manager and reported to the Plant Manager Steve Frederickson. (Plaintiff Dep. at p. 112). In the chain of command, Griffin was multiple levels above Plaintiff. In fact, he was responsible for overseeing the entire Tyson Plant. (*Id*.). According to Plaintiff, one day Griffin was upset that meat was getting piled up on the floor. (*Id*. at p. 113). Plaintiff alleges that Griffin used profanity over the radio. (*Id*. at p. 114). Specifically, Griffin allegedly made the following comment to Rob Nelson, the General Supervisor in the Pork Slice Department: "I need your damn line, take all your shit from the floor, make sure all the meat, nobody pile up with the meat." (*Id*. at pp. 113, 115-116). No one filed a complaint about Griffin's comment. (*Id*. at p. 114).

### 11. Mara Phelps

Phelps was a Quality Assurance Manager, and Plaintiff believes she reported to Steve Frederickson. (Plaintiff Dep. at p. 145). Plaintiff heard that Phelps screamed at another employee in the Quality Assurance Department. (*Id*. at pp. 146-147). Plaintiff was not present for this incident, and he does not know what Phelps allegedly said. Similarly, Plaintiff does not know whether Phelps was disciplined for this alleged incident. (*Id*. at p. 147).

Plaintiff contends "for purposes of establishing a *prima facie* case, it is important to not only compare the employees based on the similar employment status, but also similar conduct involved in each situation." (Docket Entry No. 32 at 13). According to Plaintiff, all of the named comparators used profanity at work, with the exception of Troy Williams. (*Id*. at 14). Furthermore, "[Hassan] Mouchel expressed his anger by kicking a trash can during the same incident that led to [Plaintiff's] termination; that is no different from [Plaintiff] tapping the metal tray." (*Id*.).[10]

As Defendant points out, Plaintiff's argument appears to be that he was terminated for merely using profanity. *See* (Docket Entry No. 37 at 3). However, Defendant's investigation, as well as the record in this case, establishes that Plaintiff violated company policies, when he "lost his temper, got up into Hassan's face yelling and using profanity . . . when [Plaintiff] walked away he hit the tray cart creating a loud boom" – not just the use of profanity. *See* (Plaintiff Dep., Exh. 16). Furthermore, Plaintiff does not dispute Tyson's reason for terminating him. *See* (Docket Entry No. 33, ¶¶ 14-33). Here, Plaintiff has failed to proffer evidence showing the employment situation of the comparators were similar to him in *all* relevant aspects. *See Romans,* 668 F.3d at 837.

The undisputed facts[11] make clear that Plaintiff was terminated for violating company policies and procedures.[12] As a general matter, the Court is mindful that challenging the

---

[10] The Court is unclear as to why Plaintiff makes this argument, since he failed to include Mouchel as one of the eleven comparators.

[11] Defendant submitted to Plaintiff ninety-six statements of undisputed fact. Out of those ninety-six, Plaintiff disputed only one (No. 34) and did not respond to another (No. 13). The remaining statements were undisputed. *See* (Docket Entry No. 33).

[12] Out of the eleven comparators mentioned by Plaintiff, he only appears to have been present for seven of the incidents. Therefore, the other four were not based on his personal knowledge. "Hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 2004). As to others (with the exception of Ausbrooks), the incident was either not reported or he lacks

soundness of the employer's business judgment does not establish discrimination. *See Majewski v. Auto. Data Processing, Inc.,* 274 F.3d at 1106, 1116 (6th Cir. 2001); *Loper v. Computer Network Tech. Corp.,* 128 F.Supp.2d 1061, 1066 (E.D.Mich. 2001). Furthermore, disputing the facts that provided the basis for the discharge is also not enough to survive summary judgment. *Abdulnour v. Campbell Soup Supply Co., LLC,* 502 F.3d 496, 502 (6th Cir. 2007) (citing *Braithwaite v. The Timken Co.,* 258 F.3d 488, 494 (6th Cir. 2001)). The Court finds the reasons provided by Defendant, are in fact, sufficient to motivate discharge.

Even assuming that Plaintiff has satisfactorily proven his *prima facie* case, Defendant proffers adequate evidence showing legitimate non-discriminatory reasons for terminating Plaintiff (Tyson's Rules of Conduct Policy was discussed with Plaintiff at the time of his hire, and he received yearly training on the policy; Plaintiff understood that Tyson expected its employees to conduct themselves in an appropriate manner and that unacceptable conduct was not tolerated; Hassan Mouchel's complaint against Plaintiff was substantiated by numerous witnesses; and Defendant's investigation concluded that Plaintiff violated the company policies) – and Plaintiff has failed to demonstrate that the proffered reasons were mere pretext for discrimination. Accordingly, summary judgment is granted regarding Plaintiff's claim of national origin discrimination.

## **CONCLUSION**

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 22) will be granted and this case will be dismissed with prejudice.

---

knowledge to whether it was or not. Furthermore, "[r]umors, conclusory allegations and subjective beliefs . . . are wholly insufficient to establish a claim of discrimination as a matter of law." *Mitchell*, 964 F.2d 577, 584-85.

An appropriate Order shall be entered.

_Kevin H. Sharp_
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE